DAVID R. FLYER, CA Bar No. 100697
davidflyer@flyerandflyer.com
RAQUEL FLYER, CA Bar No. 282248
raquelflyer@flyerandflyer.com
**FLYER & FLYER**
A Professional Law Corporation
4120 Birch St., Suite 101
Newport Beach, CA 92660
Telephone:   (949) 622-8444
Facsimile:   (949) 622-8448

Attorneys for Plaintiff
LEAH SNYDER

THOMAS M. MCINERNEY, CA Bar No.
162055
tmm@ogletree.com
**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.**
One Embarcadero Center, Suite 900
San Francisco, CA 94111
Telephone:   (415) 442-4810
Facsimile:   (415) 442-4870

Attorneys for Defendant
ALIGHT SOLUTIONS LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LEAH SNYDER,

　　　　　　Plaintiff,

vs.

ALIGHT SOLUTIONS, LLC, an Illinois
Limited Liability Co., and DOES 1 to 10,

　　　　　　Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 8:21-cv-00187-CJC (KESx)

**JOINT STIPULATION ON
DISCOVERY DISPUTE**
U.S. District Court Local Rule 37-2.1
Discovery Cutoff:   June 30, 2022
Pretrial Conf.:   October 31, 2022
Trial Date:   November 8, 2022
District Judge: Honorable
　　　　　　　Cormac J. Carney
Courtroom 9B, Santa Ana
Magistrate Judge: Karen E. Scott

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS:

　　　　COMES NOW, Plaintiff LEAH SNYDER and Defendant ALIGHT SOLUTIONS,

LLC, an Illinois Limited Liability Co., and jointly provide their Local Rule 37-2.1

stipulation on discovery dispute.  The parties met and conferred in writing, at Exhibit "D,"

to the concurrently filed declaration of Raquel Flyer Dachner, and by telephone on

December 21, 2021, at 11:00 a.m.

///

# 1. <u>Issue</u>

At deposition, in a case involving wrongful termination of 20 year employee based on violation of her right of political speech and assembly under Labor Code §§1101 and 1102, Plaintiff asked Defendant's witness a question on a political subject.  Defendant objected and instructed the witness not to answer.  Defendant has taken that position that it was justified in terminating Plaintiff because she was present during a riot.  The objection and instruction, made by a white man in a deposition taken by a woman of color, was based on alleged protection of the rights of non-parties.  Attorney Thomas McInerney, a white man, then compounded his groundless objection by falsely accusing the examining Attorney Raquel Flyer Dachner, a woman of color, of racism.  It must be further noted, that Defendant's witnesses exchanged emails which have been produced in discovery, where they were joking about the termination of employment.  Further, Defendant asked wide ranging political questions during Plaintiff's deposition.

The question and beginning of the objection is set forth below, at Robinson deposition transcript taken November 18, 2021, 109:8-112:11, reproduced at Ex. "A."

Q Would you describe some of the Black Lives Matter rallies as riots, and turning into unlawful activity?

MR. McINERNEY: Objection. Vague and ambiguous.  That's like a really repugnant line of questioning. You're suggesting that, what, you're picking out demonstrations involving African American-related issues, and asking about that? What about like millions of other protests? Why are you focusing on Black Lives Matter? I find that offensive.

Mr. McInerney then instructed his witness not to answer.  Plaintiff seeks to re-open the deposition of Kaleen Robinson, Defendant's Vice President of Human Resources, remotely, on this subject, for at least one hour, at Defendant's cost.  This procedure was approved by the Court at Doc. 50.

///

# TABLE OF CONTENTS

Page No.

1. Issue ...................................................................................................... 2

   Table of Contents ................................................................................. 3

   Table of Authorities ............................................................................ 4

2. Plaintiff's Position ............................................................................... 5

   A.   Plaintiff's Background Summary ............................................. 5

   B.   Plaintiff's Memorandum of Points and Authorities ........................................ 10

   (1) There is No Objection Except Privilege which is Inapplicable ................... 10

   (2) There is No Objection which can be Asserted to Protect

        Non-Parties ...................................................................................... 11

   (3) Inserting Insults and Name Calling to Censure Questioning

        Is Unprofessional ................................................................................ 11

   C.   Plaintiff's Conclusion ................................................................. 12

3. Defendant's Position ................................................................................ 13

   A.   Introduction ................................................................................. 13

   B.   Relevant Factual and Procedural Overview ......................................... 14

   C.   Legal Argument ........................................................................... 16

   D.   Conclusion ................................................................................... 20

# TABLE OF AUTHORITIES

Page Nos.

### **Federal Cases**

*Cal. Sportfishing Prot. All. v. Chico Scrap Metal*
  299 F.R.D. 638 (E.D. Cal. 2014 .................................................................. 11

*Jadwin v. Abraham*, 2008 Wl 4057921 (E.D. Cal. 2008) .................................... 11

### **State Cases**

*Britt v. Superior* Court, 20 Cal.3rd 844 (1978)................................................ 16,17

*Open Space Santa Monica Mtns. v. Superior Ct.*, 84 Cal.4th 235 (2000) ......................... 16,17

*People v. Jenkins*, 22 Cal.4th 900 (2000) .......................................................... 10

*Williams v. Superior Ct.*, 3 Cal.5th 531 (2017)................................................. 16-17

### **Federal Statutes**

Fed. Rules of Civil Procedure, Rule 11(b) ...................................................... 10,11

### **State Statutes**

Cal. Labor Code §§1101 and 1102 ................................................................... 2

Cal. Rules of Professional Conduct, Rule 8.4.1(b)............................................ 10,11

## 2. **PLAINTIFF'S POSITION**

A.    **PLAINTIFF'S BACKGROUND SUMMARY:**

Plaintiff was employed for over 20 years as a computer programmer and coder by Defendant, a human resources company with over 15,000 employees.  Contrary to Defendant's position that she was only employed for a couple years – Plaintiff was employed by the same company which was purchased by Defendant, and its predecessor-in-interest companies (Hewlit, Aon and even Alight has also just recently changed owners), with the same supervisors, same co-workers, same customers, same position and same job duties for over 20 years.  On her own time, she visited Washington, D.C., on January 6, 2021.  She listened to speeches and walked to the Capitol, then she left.  She did not participate in any rioting, she did not observe any rioting, and she did not hear of any injuries to persons or damages to property during her peaceful visit.  On return home, she posted two "selfies" with her friends in front of the Capitol to a comment thread on the social media.  She believed she was engaging in a debate over the nature and scope of a political rally at the Capitol. A third party responded to her post by vile and vicious insults and placed some of the posts on Defendant's social media page.  Many of the insults were specifically demeaning to Plaintiff based on her gender.  Plaintiff was required by her employer to report harassing conduct.  When Plaintiff registered a complaint that she was the victim of cyberbullying with Defendant's Human Resources Department, she was terminated within 48 hours.

On November 18, 2021, Plaintiff by Attorney Dachner conducted the deposition of Kaleen Robinson, Vice President of Human Resources for Defendant.  Attorney McInerney interrupted the deposition and instructed the witness not to answer as follows, at Ex. "A:"

Q Would you describe some of the Black Lives Matter

rallies as riots, and turning into unlawful activity?

MR. McINERNEY: Objection. Vague and ambiguous.

That's like a really repugnant line of questioning. You're
suggesting that, what, you're picking out demonstrations involving
African American-related issues, and asking about that? What
about like millions of other protests? Why are you focusing on
Black Lives Matter? I find that offensive.

MS. DACHNER: You can answer the question.

MR. McINERNEY: What relevance is it whether she knows
if Black Lives Matter protests ever turned violent?  What does that
have to do with your case, or any issue in this dispute?

MS. DACHNER: Well, we --

MR. McINERNEY: We've established what the connection is. I'm
not, we're not gonna get into this issue and have you asking, trying
to like make some ridiculous comparison. That's offensive. And
racist.

MS. DACHNER: It's not racist, and I take offense to you
saying that. My reasoning is, Ms. Robinson has referred to seeing
the news, we've seen emails from the CEO of Alight saying the
news is really scary about what happened on January 6th. The
news these past two years have also shown burning buildings,
riots, and there's been a lot of these Black Lives Matter protests
that have turned into destruction of property, and this has been on
the news as well. So if we're going to point to news articles and
say that they scared us, it's only –

MR. McINERNEY: You can -- Okay, Raquel, you can
make that argument and have at it in front of our judge.
You're not going to start questioning witnesses about whether they
have seen reports that Black Lives Matter protests in unspecified

areas turned violent, and get their opinions on Black Lives Matter. That's just ridiculous, and I'm not going to allow you to get into that. You can take it up with the court, and say that you want to question people about their reactions to Black Lives Matter protests and whether or not they turned violent. That is just, it's beyond the pale, frankly.

MS. DACHNER: Really, what it goes to, if you're going to take the position that the news articles showed you the facts on what to rely on in making these conclusions, then other news articles and what's in the media should also be relevant.

MR. McINERNEY: But not about Black Lives Matter. Okay, have at it in arguing that standing next to a broken window at the U.S. Capitol on January 6th was perfectly legal and compliant, you can make that argument. You're now trying to get into Black Lives Matter, and raise some suggestion that has no, I think, no bearing on this case, and we're not going to start getting into allowing discovery into what various witnesses' perceptions are of Black Lives Matter, and civil rights, and the rights of Black citizens in this country.

MS. DACHNER: I'm not --

MR. McINERNEY: If you want to turn it into a racially motivated line of questioning, we're not going to let it.

MS. DACHNER: I'm not asking about race.

MR. McINERNEY: Yes, you are.

MS. DACHNER: I'm asking about, there's been other depictions in the news media, showing burning buildings, these riots that have occurred in other cities throughout the country.

MR. McINERNEY: There have been riots, there have been demonstrations for hundreds of years. It's interesting that you identify one, Black Lives Matter, involving African Americans.

MS. DACHNER: I'm talking about the recent past two years. It's relevant of what's been in the media in the last two years.

MR. McINERNEY: It's not. Her view of Black Lives Matter and the like has no bearing on this case. Focus on what you're client's claims are. It has nothing to do with Black Lives Matter.

MS. DACHNER: Are you instructing her not to answer?

MR. McINERNEY: Yes. You haven't established any bearing.

Whether there was a riot on January 6, 2021, is a matter of opinion and perspective. Further, it is clear beyond cavil that Plaintiff herself did not participate in any rioting, she broke no property, she crossed no barricades, she injured no one, she observed no one causing injury to others or damaging property, and she did not enter the Capitol. She asked law enforcement officers whether she was allowed to be in the places where she walked. The law does not go so far as to criminalize observers exercising freedom of speech and assembly.

The relevance of political questions propounded to Ms. Robinson had to have been manifest to Attorney McInerney, since he inquired at length about Plaintiff's political views. His questions may have been sincerely propounded to investigate the legitimacy of Plaintiff's claim to have been engaging in free speech and free assembly. The questions may also have had a sinister purpose, such as to discover alleged ties to some purported underworld conspiracy to take over the government. The questions and answers were

permitted at Plaintiff's deposition on October 21, 2021, and the following examples are

offered from her transcript 233:3-16, at Ex. "B:"

> Q #wwg1wga, does that ring a bell?
>
> A Yeah.
>
> Q What does that stand for?
>
> A It stands for "Where we go one, we go all."
>
> Q That's kind of a QAnon slogan, right?
>
> A I don't know if the two go together or not.  Probably. I don't
>
> know.
>
> Q I think it is.
>
> What about #January6th?
>
> A I do follow the January 6th just because I like to see all the
>
> updates coming in on both sides of the narrative.
>
> Q Why?
>
> A Because I want to know the truth.

Defendant was not blocked from asking questions about political subjects, no matter

how tangential to the main issue of whether Plaintiff participated in a riot.  Further,

Defendant's key employees who investigated Plaintiff's actions and posts about her on

social media, joked about the matter and were gleeful in getting to participate in the

termination of an alleged member of the opposition.  The following passages from emails

were produced at Ms. Robinson's deposition, at Ex. "C" which were Exhibits "3" and "5:"

> [While talking to one employee, Ms. Robinson wrote a text to another person
>
> about termination of Plaintiff's employment]:
>
> "Kaleen Robinson 1/8/2021 6:35 p.m.
>
> I'm on the phone w/Kelly [Tabor, HR Connect Consultant] right now, updating
>
> her. **LOL**."
>
> [Ms. Robinson sent the following text]:

"Kaleen Robinson 1/12/2021 11:38 a.m.

So ... why would Leah still be showing as active in WD?? I termed her effective yessterday [sic] **I'm having a heart attack about it!**"

[Emphasis added].

It was acceptable for Defendant to inquire about Plaintiff's political beliefs. It was acceptable for Defendant's employees to joke about Plaintiff's termination after 20 years employment. But, it was not acceptable to inquire about a political agenda in Defendant's organization – Mr. McInerney immediately censured such inquiry. Mr. McInerney had no standing to assert his white privilege and object, purportedly to protect non-parties.

Fundamentally, Mr. McInerney, a white man, violated FRCP Rule 11(b) and the *Cal. Rules of Professional Conduct, Rule* 8.4.1(b) by denigrating, demeaning and harassing a person of color during a deposition. There is no justification for such indecent conduct. Defendant must be sanctioned for this offense.

## B.   PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

### (1) There is No Objection Except Privilege which is Inapplicable

Defendant previously argued to this Honorable Court that at deposition an attorney cannot object and instruct a witness to refuse to answer, except based on privilege. See the cases previously cited by Defendant at Doc. 46, 12:6-17:

Preliminarily, "relevance" is an improper basis to instruct a witness not to answer a deposition question. *Dominguez v. Los Angeles*, 2018 WL 6332279, *4 (C.D. Cal. 2018), citing *Doe v. City of San Diego*, 2013 WL 6577065, at *6 (S.D. Cal. 2013) ("[A] relevance objection is an insufficient basis for instructing a deposition witness not to answer."); *see also Covington v. Curtis*, 2013 U.S. Dist. LEXIS 53406, at *6 n. 2 ("An attorney may not instruct a witness not to answer a question on the ground that it has been asked and answered ... or is irrelevant."); *Jadwin v. Abraham*, 2008 WL 4057921 (E.D.

Cal. 2008) ("[A]n objection that the question might have been repetitive was not a proper basis to instruct the witness not to answer it.").

Since no privilege was claimed on behalf of his client, Mr. McInerney could not object on grounds of relevance.

**(2) <u>There is No Objection which can be Asserted to Protect Non-Parties</u>**

There was no privilege protecting deponent related to her knowledge about activities of non-parties.  A deponent has no standing to complain of a potential violation of a non-party's privilege unless the deponent herself is subject to jeopardy, see *People v. Jenkins* (2000) 22 Cal.4th 900, 965–966.  Similarly, a party witness generally has no standing to object and instruct his own witness against answering questions related to a privilege owned by a non-party in production of documents, see *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 299 F.R.D. 638, 643 (E.D. Cal. 2014).  Mr. McInerney had no right to object because he believed someone else's feelings could be hurt.

Since Defendant's justification for employment termination was Plaintiff's alleged participation in a riot, Plaintiff is entitled to discover whether the offered justification was pretextual.  A question testing whether Defendant compared Plaintiff's participation in a political rally to actual riots, where looting, killing and arson occurred, is clearly relevant and could lead to other evidence that Defendant was unduly biased against a colleague with opposing political views.

**(3) <u>Inserting Insults and Name Calling to Censure Questioning is Unprofessional</u>**

Attorney McInerney objected and instructed his witness not to answer questions at deposition.  FRCP Rule 11(b) required him to have a legitimate purpose for inserting his own opinions into the examination.  There were no valid grounds for objection.  The propounded question did not seek privileged information and an answer to the question could have lead to relevant information.

Mr. McInerney, a white man, made an objection and hurled the ultimate insult of racism in order to stop any debate.  His name calling was calculated to unduly harass and

embarrass the deposition examiner, a person of color.  This amounted to violation of *Cal. Rules of Professional Conduct, Rule* 8.4.1(b)(1).  Mr. McInerney had no clear understanding of the meaning of chivalry as explained by Rudyard Kipling's "the white man's burden."  Instead, accusing Attorney Dachner of racism served no legal purpose.  The insult was more likely hurled as an invitation to fisticuffs, see *Jadwin v. Abraham,* 2008 WL 4057921 (E.D. Cal. 2008) [Doc. 46, 11:19-21].  Mr. McInerney lacks decency.

## C.   PLAINTIFF'S CONCLUSIONS

There was no privilege and no justification for interrupting the deposition, let alone instructing a witness not to answer.  The question propounded was likely to lead to admissible evidence in a case where a 20 year employment was terminated for alleged participation in a riot.  It is more likely that the grounds for termination were pretextual, since Defendant's employees joked about the termination and appeared relieved to have eliminated a colleague with opposing political views.  By comparison, Defendant asked far ranging questions at deposition regarding Plaintiff's political values.  Defendant had no standing and no right to assert that some unrepresented party could have his or her feelings hurt by the questioning as grounds for instructing a witness not to answer.  But, the bottom line is in an effort to crush the questioning, Attorney McInerney resorted to insults, derogation and harassment.  His conduct has no place in a legal proceeding.

### 3. DEFENDANT'S POSITION

**Introduction**

Plaintiff Leah Snyder's Motion to Compel is no more than a thinly-veiled reprisal for Alight Solutions LLC's prior successful effort to compel her to answer additional deposition questions. (*See* ECF No. 50.) Her counsel made this clear during the parties' meet and confer call, stating that Snyder would only accept Alight's proffer of a declaration in lieu of testimony if Alight accepted the same from Snyder. But Snyder's misdirected and frankly offensive query of a third party witness' private political views and affiliations is not the same as Alight's earlier effort to ask Snyder how she found her attorney.

Vice President of Human Resources Kaleen Robinson simply assisted with Alight's investigation of Snyder's January 6, 2021 activities. Robinson did not make the decision to terminate Snyder's employment. Contrary to Snyder's deliberate misrepresentation of her testimony, Robinson made clear she never "joked about the matter [or felt] gleeful in getting to participate in the termination of an alleged member of the opposition." Robinson also confirmed that Alight did not advertise or endorse specific political candidates. She did not know whether other Alight employees contributed to particular political organizations. She did not know whether Democratic candidates spoke at Alight events. She did not know whether Alight terminated any other employees for participating in riots or political events that turned violent or destructive. If, as Snyder argues "[w]hether there was a riot on January 6, 2021, is a matter of opinion and perspective," then Snyder's questionable implication that only Black Lives Matter-affiliated events are "actual riots, where looting, killing and arson occurred" is equally "a matter of opinion and perspective." In that case, there is zero justification to invade the associational privacy of a third-party with no role in the employment termination decision, merely to probe her opinion on whether "some of the Black Lives Matter rallies [are] riots and turning into unlawful activity."

The Court should not indulge Snyder's gamesmanship. Her Motion to Compel is meritless and should be denied.

## B.      Relevant Factual and Procedural Overview

Snyder was terminated for violating Alight company policies after she participated in the insurrection that occurred at the U.S. Capitol on January 6, 2021.[1]  She later sued Alight alleging wrongful termination of employment in violation of public policy and breach of covenant of good faith and fair dealing.  (*See* ECF Nos. 1, 30.)  The former claim is premised on Snyder's allegation that Alight "discharged Plaintiff for exercising her constitutional rights to speak freely, peaceably assemble or petition her grievances to the Government" in violation of protections against employer control of employee political activities found in California Labor Code sections 1101 and 1102.  (Compl., ¶¶ 23-24, ECF No. 1.)  Snyder's own allegations thus place her own political activities and affiliations squarely at issue in this suit.

Snyder's counsel deposed Alight's Vice President of Human Resources Kaleen Robinson on November 18, 2021.  (*See* concurrently-filed Declaration of Thomas M. McInerney ["McInerney Decl."], ¶ 2.)  During her deposition, Robinson described her involvement in the investigation preceding Snyder's employment termination—she spoke with Snyder on Friday (January 8, 2021) and again on Sunday (January 10, 2021). (McInerney Decl., ¶ 2, Ex. 1 [Robinson Tr. 66:13-20, 104:6-23].)  She had no other knowledge of the decision-making process leading to Snyder's employment termination.  (*Id.* [Robinson Tr. 78:1-79:4].)  Robinson confirmed that Alight did not endorse political candidates or particular political views.  (*Id.* [Robinson Tr. 63:13-16, 65:3-10].)  She did not know whether other Alight employees contributed to ActBlue or the Black Lives Matter organization.  (*Id.* [Robinson Tr. 64:1-18].)  Nor did she know whether particular political candidates had ever spoken at Alight events.  (*Id.* [Robinson Tr. 64:19-65:2].)  And while Robinson confirmed that no employees other than Snyder were terminated for being near

---

[1]      It is unclear why Snyder continues to insist that she "was employed for over 20 years as a computer programmer and coder…."  As Alight has already explained, it hired Snyder on June 25, 2018.  Because this point is immaterial to the issues raised in Snyder's Motion to Compel, Alight will not address it further at this time.

the Capitol on January 6, she did not know whether Alight terminated any other employees for participating in riots, or for participation in a political event that turned violent or destructive.  (*Id.* [Robinson Tr. 108:18-109:4].)

Once Snyder's counsel exhausted possible questions about the general political discourse (or lack thereof) at Alight, she focused exclusively on the Black Lives Matter movement, bizarrely ignoring every other contemporary political movement.  She asked Robinson:

- "In the Chicago office that you work out of, would you say that office culture there is supportive of BLM or Black Lives Matter?"
- "And would you say, in your communication with the other individuals from the Lincolnshire office, there's been support for the Black Lives Matter, BLM, movement?"
- "Are you aware if any Alight employees participated in rallies for Black Lives Matter?"

(*Id.* [Robinson Tr. 65:11-66:12, 109:5-7].)  Robinson responded "I am not aware" or "I have no idea" to each of the above questions.  (*Id.*).

Despite Robinson's testimony about her limited role in Snyder's employment termination, testimony that she did not know whether other employees had been terminated for participation in violent political events, and testimony that she did not know whether Alight employees participated in Black Lives Matter rallies, Snyder's counsel nonetheless insisted on probing Robinson's private political views and affiliations further, asking "[w]ould you describe some of the Black Lives Matter rallies as riots, and turning into unlawful activity?" (*Id.* [Robinson Tr. 109:8-9].)  Alight's counsel promptly objected to what appeared to be a racially-motivated line of questioning that falsely equated the specific events of January 6, 2021 with vague allusions to violence in connection with the Black Lives Matter movement.  (*See* McInerney Decl., ¶¶ 2-3, Ex. 1 [Robinson Tr. 111:2-15].)

Although counsel for the parties unsuccessfully debated the point, at no point did Alight's counsel "denigrate, demean, and harass" Snyder's counsel.

After the conclusion of Robinson's deposition, Snyder's counsel sent a letter on December 9, 2021, demanding Alight agree to re-open the deposition.  (*See* Declaration of Raquel Flyer Dachner, ¶ 5, Ex. D.)  Snyder's counsel argued that Robinson's further testimony was relevant to show pretext (despite Robinson having no role in the termination decision, lack of knowledge of her colleagues' political views, and lack of knowledge of other terminations due to political activities).  (*Id*.)  Counsel for the parties met and conferred telephonically on December 21, 2021.  (*See* McInerney Decl., ¶ 6, Ex. 2.)  During the conference, Alight's counsel offered to resolve the issue by providing a declaration from Robinson limited to the unanswered question.  (*Id.*)  Snyder's counsel declined and stated that he would not accept any compromise that did not include a further deposition of Ms. Robinson where she could be probed further regarding her personal opinions regarding "Black Lives Matter." (*Id*.)

## C.    Legal Argument

Long-established California precedent permits "intrusion into associational privacy …only upon the demonstration of a very important, indeed 'compelling,' state interest which necessitates the disclosure.…[E]ven when such justification is present, the scope of the compelled disclosure must be narrowly circumscribed to avoid undue interference with private associational rights." *Britt v. Superior Ct.*, 20 Cal. 3d 844, 848–49 (1978).  "[T]he right to associate with an organization is not limited to the right to become a member of that organization.  Individuals can choose to associate with groups in any of a number of forms, including the making of financial contributions." *Save Open Space Santa Monica Mountains v. Superior Ct.*, 84 Cal. App. 4th 235, 251, (2000), *disapproved of on other grounds by Williams v. Superior Ct.*, 3 Cal. 5th 531, 398 P.3d 69 (2017).  Where this privacy interest is at stake, the court must engage in a balancing test:

The party asserting a privacy right must establish a legally protected privacy interest, an objectively reasonable expectation of privacy in the given circumstances, and a threatened intrusion that is serious. [citation] The party seeking information may raise in response whatever legitimate and important countervailing interests disclosure serves, while the party seeking protection may identify feasible alternatives that serve the same interests or protective measures that would diminish the loss of privacy. A court must then balance these competing considerations.

*Williams v. Superior Ct.*, 3 Cal. 5th 531, 552 (2017).

*Britt* and *Save Open Space Santa Monica Mountains* are clear that Snyder's questions went to Robinson's personal and private perceptions of the Black Lives Matter organization and its mission, as well as her involvement, if any, with either the organization or the broader movement.  Robinson had already testified that she was not the decisionmaker regarding Snyder's termination and that she was unaware of any actions taken by Alight related to Black Lives Matter rallies.  While responding to the sole and specific question "Would you describe some of the Black Lives Matter rallies as riots, and turning into unlawful activity?" might not be a serious intrusion by itself, Snyder has rejected Alight's offer to do just that.  Her rejection plainly indicates she seeks an extended examination of Robinson's personal political activities and affiliations.  But Snyder has identified no "legitimate and important countervailing interests" to justify such an examination.  At best, her motion seems to argue that such an examination is necessary because "[i]t is more likely that the grounds for termination were pretextual, since Defendant's employees joked about the termination and appeared relieved to have eliminated a colleague with opposing political views."  The latter is an intentional misrepresentation of Robinson's testimony and the former lacks any connection to the proposed question.

First, Robinson's testimony is clear that she did not think Snyder's employment termination was funny.  She explained:

Q.     And you're updating her, meaning you're updating Kelley that Ms. Snyder is on administrative paid leave.  "Lol," by that you meant "laugh out loud"?

A.     Yes.

Q.     So after telling someone that you're putting Ms. Snyder on administrative leave, you were then laughing about it --

A.     No.

Q.     -- so was it a joke to you?

A.     No. That is not what I was doing. What I was laughing about was that fact that whoever I was pinging with, we were kind of in sync, and she was talking to Kelley, and I had just talked to Kelley, or I was on the phone with Kelley right at that moment, and so our wires were, you know, all happening at the same time. That's what, I was not laughing about the case.

(McInerney Decl., ¶ 2, Ex. 1 [Robinson Tr. 80:3-81:21, Ex. 3].)

Nor was Robinson secretly relieved in some way to terminate Snyder's employment (which she did not do).  She also explained:

Q.     The top box, your third comment down, you wrote on January 12th, 2021 at 11:38 a.m., "So why would Leah still be showing up active in WD? I termed her effective yesterday. I'm having a heart attack about it."

What is "WD"?

A.     WorkDay.

Q.     So you had already terminated her; so why is she still showing up as active?

A.     That is correct. I was asking why it was showing that way.

Q.     And you said you were having a heart attack. Again, you were joking; you weren't really having a heart attack. Correct?

A.   It's an expression of speech. I had, I had a moment of panic because I knew that I had put her through effective the day before, and I didn't understand why it was showing in WorkDay something different.

Q.   Why was that causing you to panic?

A.   Because my directions had been very clear, to ensure that she was terminated effective Monday.

Q.   You didn't want her to still be employed a second longer than that; correct?

A.   No. When someone gets terminated, you want to make sure that records accurately reflect the way they're supposed to reflect, and I was concerned why the system wasn't reflecting what I thought I had put in.

(*Id*. [Robinson Tr. 82:22-83:25, Ex. 5].)  Snyder's argument ignores everything Robinson said to place the exhibit language in context.

Second, although Alight does not dispute that pretext is a relevant issue in this case, it is an issue Snyder's counsel ***already fully explored with Robinson***.  Again, Robinson testified to her involvement in the investigation preceding Snyder's employment termination—she spoke with Snyder on Friday (January 8, 2021) and again on Sunday (January 10, 2021).  (*Id*. [Robinson Tr. 66:13-20, 104:6-23].)  She had no other knowledge of the decision-making process leading to Snyder's employment termination.  (*Id*. [Robinson Tr. 78:1-79:4].)  Robinson did not know whether Alight terminated any other employees for participating in riots; she did not know whether Alight terminated any other employees for participation in a political event that turned violent or destructive.  (*Id*. [Robinson Tr. 108:18-109:4].)  She was not aware if any Alight employees participated in rallies for Black Lives Matter.  (*Id*. [Robinson Tr. 109:5-7].)  Against the backdrop of this testimony, whether Robinson would or would not describe some of the Black Lives Matter rallies as riots is wholly immaterial.

Snyder's counsel also appears to feel the unidentified race of his co-counsel/daughter and his perception of defense counsel's race is somehow relevant to this motion.  They are not.  At no point did defense counsel make any racially derogatory comment or otherwise act unprofessionally.  Rather, defense counsel took issue with plaintiff's counsel's fixation on the immaterial personal views of a witness (who was uninvolved in the decision to terminate Snyder and testified she did not know of any Alight employees who participated in Black Lives Matter protests) regarding a protest movement supportive of civil rights for African Americans.

In short, the total absence of any "legitimate and important countervailing interest" dooms Snyder's argument.  It is clear Robinson has a privacy interest in her political activities and affiliations and nothing has been cited to justify the invasion of that privacy interest.  To remove any doubt on this issue, Alight remains prepared to provide Robinson's declaration explaining her perception of whether "some of the Black Lives Matter rallies [were] riots, and turning into unlawful activity" as well as clarifying that she is unaware of any complaints raised about other employees' political activities (as was the case with Snyder [*see* Compl., ¶¶ 10-11] ).

## D.   Conclusion

Because Snyder has not identified a single legitimate non-private interest that would be furthered by compelling Robinson to provide her private political activities and affiliations, Alight respectfully requests the Court to deny her motion to compel.  Alternatively, Alight requests the Court endorse its proffer of a declaration from Robinson on the points outlined above.

Respectfully submitted,

FLYER & FLYER,
A PROFESSIONAL LAW CORPORATION

Dated: January 5, 2022                    By:  /s/ David R. Flyer

David R. Flyer
Raquel Flyer Dachner
Attorneys for Plaintiff
LEAH SNYDER

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.

Dated: January 5, 2022                    By:  /s/ Thomas M. McInerney

Thomas M. McInerney
Kathleen J. Choi
Attorneys for Defendant
ALIGHT SOLUTIONS LLC