KATHLEEN J. CHOI, CA Bar No. 284428
kathleen.choi@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA  90071
Telephone:  213-239-9800
Facsimile:   213-239-9045

THOMAS M. MCINERNEY, CA Bar No. 162055
tmm@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA  94111
Telephone:  415-442-4810
Facsimile:   415-442-4870

Attorneys for Defendant
ALIGHT SOLUTIONS LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEAH SNYDER,<br><br>                Plaintiff,<br><br>        v.<br><br>ALIGHT SOLUTIONS, LLC, an Illinois Limited Liability Co., and DOES 1 TO 10,<br><br>                Defendants. | Case No. 8:21-cv-00187-CJC (KESx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:         July 25, 2022<br>Time:        1:30 p.m.<br>Place:       Courtroom 9B<br><br>[Filed concurrently with Notice of Motion and Motion for Summary Judgment; Separate Statement of Uncontroverted Facts and Conclusions of Law; Request for Judicial Notice; Declaration of Kathleen Choi; [Proposed] Order; [Proposed] Judgment]<br><br>Discovery Cut-off:    June 30, 2022<br>Pre-Trial Conference: October 31, 2022<br><br>Complaint Filed:    January 26, 2021<br>Trial Date:             November 8, 2022<br>District Judge:     Hon. Cormac J. Carney<br>Magistrate Judge:Hon. Karen E. Scott |

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................ 1

II. BRIEF STATEMENT OF LAW REGARDING ACCESS TO UNITED STATES CAPITOL GROUNDS ............................ 2

III. STATEMENT OF UNDISPUTED FACTS ............................ 4

    A.  Alight expects its employees to behave professionally and follow all laws whether on social media or otherwise. ............... 4

    B.  Alight hired Snyder as an at-will Programmer II effective June 19, 2018. ........................................................ 5

        1.  Snyder traveled to Washington, D.C., on January 4 to attend President Trump's "Save America Rally" on January 6, 2021. .......................................... 6

        2.  After Snyder posted "selfies" taken during the January 6 riot to a former schoolmate's Facebook page, her former schoolmate forwarded a screenshot to Alight. ............................................ 8

        3.  Alight separately investigated Snyder's Facebook posts and her later cyberbullying complaint. .................. 10

        4.  After concluding Snyder trespassed into a closed area on the Capitol grounds, then publicized her activities on Facebook, Alight terminated her employment ................................................. 12

IV. LEGAL ARGUMENT ..................................................... 13

    A.  Standard of Law ..................................................... 13

    B.  Summary judgment is proper on Snyder's wrongful termination claim because Alight reasonably (and correctly) believed Snyder trespassed at the Capitol Building on January 6, 2021 ..................................... 14

        1.  Snyder cannot establish a *prima facie* claim because there is no evidence Alight's motivation for terminating Snyder's employment contravened any substantial public policy .................................. 15

        2.  Alight had a legitimate reason to terminate Snyder's employment based on the unlawful conduct publicized on Facebook and there is no evidence of pretext ................................................... 18

    C.  Summary judgment is proper on Snyder's breach of the

i

good faith and fair dealing claim because Snyder expressly agreed she would be an at-will employee. ...................20

D.      Summary judgment is proper on Snyder's request for punitive damages because there is no evidence of fraud, oppression, or malice. ....................................................................21

V.      CONCLUSION ...................................................................................22

MEMORANDUM OF POINTS AND AUTHORITIES IN
UPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

51731838_1.docx

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anderson v. Union Pac. R. Co.*,
   No. CIV.S.06-2813FCDGGH, 2008 WL 2130320 (E.D. Cal. May
   21, 2008), *aff'd*, 359 F. App'x 800 (9th Cir. 2009)................................14

*Baugh v. CBS, Inc.*,
   828 F. Supp. 745 (N.D. Cal. 1993)........................................................13

*British Airways Bd. v. Boeing Co.*,
   585 F.2d 946 (9th Cir. 1978), *cert. denied* 440 U.S. 981, *rehearing
   denied* 441 U.S. 968 .............................................................................13

*Carr v. Home Depot U.S.A., Inc.*,
   2018 WL 2329673 (S.D. Cal. May 23, 2018) ........................................21

*Couch v. Morgan Stanley & Co. Inc.*,
   656 F. App'x 841 (9th Cir. 2016)....................................................1, 16

*Lawler v. Montblanc N. Am., LLC*,
   704 F.3d 1235 (9th Cir. 2013).........................................................14, 19

*Lederman v. United States*,
   291 F.3d 36 (D.C. Cir. 2002).................................................................2

*Lew v. Superior Ct. of Cal.*,
   No. C 06-03098 CRB, 2008 WL 728895 (N.D. Cal. Mar. 17, 2008),
   *aff'd*, 348 F. App'x 227 (9th Cir. 2009) ................................................14

*Mahoney v. United States Capitol Police Bd.*,
   No. CV 21-2314 (JEB), 2022 WL 523009 (D.D.C. Feb. 22, 2022) ......3

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ..............................................................................14

*McInteer v. Ashley Distribution Services, Ltd.*,
   40 F. Supp. 3d 1269 (C.D. Cal. 2014).................................................18

51731838_1.docx

*Mircovich v. Reuters Am., LLC*,
   No. 218CV00133CASPJWX, 2019 WL 1585198 (C.D. Cal. Apr. 8,
   2019) ..................................................................................................... 14, 18

*Myers v. Park Assist LLC*,
   2015 WL 13357660 (C.D. Cal. 2015) ................................................................ 20

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ........................................................................................ 14

*Ross v. Indep. Living Res. of Contra Costa Cnty.*,
   No. C08-00854 TEH, 2010 WL 2898773 (N.D. Cal. July 21, 2010) .................. 17

*Zweig v. Hearst Corp.*,
   521 F.2d 1129 (9th Cir.1975), *cert. denied*, 1472 423 U.S. 1025
   (1975) ................................................................................................................. 13

**California Cases**

*Agosta v. Astor*,
   120 Cal. App. 4th 596 (2004) .......................................................................... 21

*Arteaga v. Brink's, Inc.*,
   163 Cal. App. 4th 327 (2008) .......................................................................... 19

*Brede v. Sci. Applications Int'l Corp.*,
   No. D061764, 2014 WL 793118 (Cal. Ct. App. Feb. 28, 2014) ........................ 14

*Camp v. Jeffer, Mangels, Butler & Marmaro*,
   35 Cal. App. 4th 620 (1995) ............................................................................ 20

*Carter v. Escondido Union High Sch. Dist.*,
   148 Cal. App. 4th 922 (2007) .......................................................................... 15

*Davis v. Consol. Freightways*,
   29 Cal. App. 4th 354 (1994) ............................................................................ 20

*Flores v. Autozone W., Inc.*,
   161 Cal. App. 4th 373 (2008) .......................................................................... 21

*Guz v. Bechtel Nat'l, Inc.*,
   24 Cal. 4th 317 (2000) ............................................................................. 20, 21

iii

*Kim v. Regents of Univ. of California*,
   80 Cal. App. 4th 160 (2000) ...................................................................... 20

*Light v. Dep't of Parks & Recreation*,
   14 Cal. App. 5th 75 (2017) ........................................................................ 19

*Nakai v. Friendship House Assn. of Am. Indians, Inc.*,
   15 Cal. App. 5th 32 (2017) ........................................................................ 18

*Scott v. Phoenix Schools, Inc.*,
   175 Cal. App. 4th 702 (2009) .................................................................... 21

*Slivinsky v. Watkins-Johnson Co.*,
   221 Cal. App. 3d 799 (Ct. App. 1990) ...................................................... 15

*Tameny v. Atl. Richfield Co.*,
   27 Cal. 3d 167 (1980) ................................................................................ 15

*Tomlinson v. Qualcomm, Inc.*,
   97 Cal. App. 4th 934 (2002) ...................................................................... 21

*Wills v. Super. Ct.*,
   195 Cal. App. 4th 143 (2011), *as modified on denial of reh'g* (May
   12, 2011) ..................................................................................................... 19

*Yau v. Santa Margarita Ford, Inc.*,
   229 Cal. App. 4th 144 (2014) .................................................................... 15

**Federal Statutes**

2 U.S.C.
   § 1969 ...................................................................................................... 2, 3

**California Statutes**

Cal. Civ. Code
   § 3294 ........................................................................................................ 21

Cal. Lab. Code
   §§ 1101 ...................................................................................................... 16
   § 2922 ........................................................................................................ 20

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................................ 13

MEMORANDUM OF POINTS AND AUTHORITIES IN
UPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

51731838_1.docx

# I.     <u>INTRODUCTION</u>

Plaintiff Leah Snyder ("Snyder"), an employee of defendant Alight Solutions LLC ("Alight"), traveled to Washington, D.C., on January 6, 2021 to attend former President Trump's "Save America Rally." By the end of his speech, rioters were already grappling with police on the Capitol steps, and would soon lay siege to the Senate and House chambers. In the midst of this stunning insurrection against the U.S. government, Snyder joined friends at the Capitol, unlawfully walking past restricted areas where police barricades had been overrun. She posed for "selfies" along the way, steps from the Capitol Building as law enforcement personnel in riot gear are visible in the background. When she reached the top of the Capitol, she posed for another photo, grinning in front of a broken window and two security officers. Afterwards, Snyder posted her photos on Facebook, attempting to justify her presence at the Capitol that day, which resulted in a heated argument with a Facebook friend unaffiliated with Alight. Alight first learned of the exchange when Snyder's Facebook friend sent the photos to its Facebook page. Deeply troubled by Snyder's disregard for the widely-reported police orders closing the Capitol grounds, and after an investigation verified that, in fact, Snyder was at the Capitol that day, Alight terminated her employment.

Clearly stung that what she describes was a "peaceful and fun day" at the Capitol on January 6 should carry consequences, Snyder filed claims for common law wrongful termination, claiming Alight retaliated against her in violation of political activity protections in sections 1101 and 1102 of the California Labor Code, and breach of the implied covenant of good faith and faith dealing. (Compl., ¶¶ 21-32 [ECF No. 1]; *see also* ECF No. 30.) Snyder fails in every instance to establish her claims. <u>First</u>, under Ninth Circuit precedent, "liability under §§ 1101(a) and 1102 is triggered ***only*** if an employer fires an employee based on a political motive." *Couch v. Morgan Stanley & Co. Inc.*, 656 F. App'x 841, 843 (9th Cir. 2016) (emphasis added). But by Snyder's own admission and the undisputed evidence, Alight never

implemented any policy that influenced the political activities or affiliations of employees. Alight also never attempted to influence its employees to follow any particular course of political activity. Nor did anyone at Alight ever indicate to Snyder that the company was displeased with her support of Donald Trump. <u>Second</u>, it is undisputed (including by Snyder's deposition testimony retracing her route at the Capitol on January 6, 2021) that she trespassed on portions of the Capitol grounds closed by order of the Capitol Police. <u>Finally</u>, Snyder admitted she signed an express employment agreement with an at-will provision, which eliminates her California common law claim for breach of the implied covenant of good faith and fair dealing.

There is simply no evidence Snyder was subjected to any unlawful act by Alight. The law does not restrict an employer's ability to sever ties with an employee it believes violated the law and who then publicized that violation on social media.

## II. BRIEF STATEMENT OF LAW REGARDING ACCESS TO UNITED STATES CAPITOL GROUNDS

The United States Capitol Grounds extend from Union Station in the North to Virginia Avenue in the South, and from Second Street Northeast to Third Streets North and Southwest, encompassing the Capitol itself as well as House and Senate office buildings, a power plant, press areas, and public open space." *Lederman v. United States*, 291 F.3d 36, 39 (D.C. Cir. 2002); (*see also* Request for Judicial Notice ["RJN"], Ex. 1 [Traffic Regulations for the U.S. Capitol Grounds].) Federal law charges the Capitol Police Board "consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol, [with] exclusive charge and control of the regulation and movement of all vehicular and other traffic…within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor…." 2 U.S.C. § 1969.

Pursuant to this statutory authority, the Board promulgated the Traffic

Regulations for the U.S. Capitol Grounds ("Traffic Regulations"), which govern, among other things, all "Demonstrations" and "Special Events" on the Capitol Grounds. (*See* RJN, Ex 1 at § 12). The regulations define "demonstration activity" as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." (UF 1.[1]) They further provide that demonstration activity is generally allowed in designated areas as indicated on the United States Capitol Grounds Demonstration Areas Map. (*Id*.; *Mahoney v. United States Capitol Police Bd*., No. CV 21-2314 (JEB), 2022 WL 523009, at \*2 (D.D.C. Feb. 22, 2022). No demonstration activity — regardless of size — is permitted on the steps of the Capitol Building or in any other area otherwise closed or restricted for official use. (UF 1.) Similarly, because the Board has the authority to temporarily deem an area "closed or restricted for official use," an area that is not marked as closed to demonstration may nonetheless be closed based on present security risks. (*Id*.; 2 U.S.C. § 1969.) As reflected below, the United States Capitol Police announced the closure of much of the Capitol grounds through February 28, 2021. (UF 2.)



---

[1]    All references to Defendant's Uncontroverted Material Facts in its Separate Statement are cited as "UF [number]."

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## III.   <u>STATEMENT OF UNDISPUTED FACTS</u>

### A.   <u>Alight expects its employees to behave professionally and follow all laws whether on social media or otherwise.</u>

Alight is a cloud-based provider of integrated digital human capital and business solutions. (Compl., ¶ 9, ECF No. 1.) Its Code of Conduct states employees must "[f]ollow the laws and our policies" and that "Alight colleagues are responsible for following the laws and policies that govern our work."[2] (UF 3.) Alight does not make any political contributions. (Snyder Tr. 239:2-10, 240:10-241:12, Ex. 28; Robinson Tr. 21:23-22:8, Ex. 1.[3]) Colleagues are free to participate in personal political activities on an individual basis and at their own time and expense. (UF 4.) Alight's social media policy and participation guidelines ("Social Media Policy") set forth restrictions around social media use, participation, and communications by employees where employees' name and title are representative of Alight and they may be identified as associated with Alight. (UF 5.) By working for Alight and identifying themselves as Alight employees, employees associate themselves with Alight and the content they post should be indicative of their professionalism and their representation of Alight on social platforms. (*Id*.) The Social Media Policy is clear that activities conducted on personal time using personal equipment that are unacceptable under the Code of Conduct, and which are not otherwise protected activity, may lead to discipline, up to and including termination of employment. (*Id*.) Examples of such conduct include any actions that are illegal. (*Id*.)

At her deposition, Snyder admitted she was not aware of any Alight rule, regulation, or policy, written or otherwise, forbidding employees from participating in off-duty political activity. (UF 6.) Snyder is not aware of any Alight rule,

---

[2]   Alight also refers to its employees as "colleagues." (Robinson Tr. 32:11-13.)
[3]   Deposition testimony is cited as "[Deponent Last Name] Tr. [page number]: [line number]." All deposition excerpts are attached to the concurrently-filed Declaration of Kathleen J. Choi.

regulation, or policy, written or unwritten, forbidding employees from becoming candidates for political office. (UF 7.) Alight never threatened Snyder about engaging in any kind of political activity. (UF 8.) Similarly, Alight never encouraged or urged Snyder to engage in any political activity. (UF 9.) No one in a management position at Alight ever indicated that it was contrary to Alight policy or that the company did not want Snyder supporting Donald Trump. (UF 10.)

### B. Alight hired Snyder as an at-will Programmer II effective June 19, 2018.

Alight employed Snyder as a Programmer II from June 19, 2018 to January 11, 2021. (Snyder Tr. 34:25-35:12, 38:1-7, 42:10-43:15, Ex. 3, 44:14-25, 103:18-104:17; UF 11.) Alight's written offer of employment to Snyder reflected the following:

- "Your start date will be 06/19/2018."
- "Your position will be a Full-time, exempt Programmer II-Defined Benefits reporting to Rob Hyde at an annual salary of $88,000…."
- Eligibility to participate in Alight's Premium Salary program and comprehensive benefits plans.
- "Nothing in this letter is intended or should be construed as a contract or guarantee of indefinite employment. Your employment with the Company is not for a specified period of time and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause. This letter supersedes any prior representation or agreements between you and the Company, whether written or oral."

(UF 11.) It was Snyder's understanding, when she went to work for Alight, that she was free to leave and pursue other jobs at any time for any reason. (UF 12.)

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1. **Snyder traveled to Washington, D.C., on January 4 to attend President Trump's "Save America Rally" on January 6, 2021.**

Believing that the 2020 election was "probably a rigged election," Snyder traveled to Washington, D.C., in January 2021 to hear Donald Trump speak while Congress prepared to certify the votes of the Electoral College. (Snyder Tr. 114:15-17, 114:18-115:24.) She arrived in the city the morning of January 4, 2021 and met up with her friends Sam Lewis, Maria ("Maale") Jaramillo, and Eric Mauldin after her arrival. (Snyder Tr. 115:25-116:6, 117:25-118:4, 116:22-117:8.)

On January 6, 2021, Snyder and her friends arrived at the Ellipse, located between the White House and the National Mall, around 7:30 to 8:00 a.m. and listened to various speakers before returning to their Airbnb around 1:45 p.m. (Snyder Tr. 130:9-22, 131:6-17.) Extensive media reports from multiple print and television outlets detailed the events of the day for the nation:

- The rally took place at the Ellipse, a park near the White House and several blocks from the Capitol. (*See* RJN, Exs. 4 at 57-59; 6 at 76, 9 at 108.)

- Even during President Trump's speech, a crowd began growing at the perimeter fencing around the Capitol grounds, which had been closed to the public by the United States Capitol Police until February 28, 2021. (RJN, Exs. 2, 6 at 76, 7 at 94-95, 8 at 103; UF 2.) By the time his speech ended, an increasingly violent mob breached the police barricades set up along some, but not all, of the perimeter. (RJN, Exs. 5 at 62-63, 68, 71, 6 at 76, 78-80, 7 at 94-95, 8 at 101, 103.)

- Rioters then streamed into the Capitol building through a door and a broken window. (RJN, Exs. 5 at 71, 6 at 78-80, 82.)

At her deposition, Snyder retraced her steps on January 6, 2021, marking her route from the Airbnb, along Pennsylvania Avenue, and eventually arriving at the

Capitol Building. (UF 13.) Her route clearly took her through areas closed to all
demonstration activity. (*See* UF 1, 2.)



Along the way, Snyder noticed some people scaling the walls, and when she
arrived at the second or third level, she saw police officers removing scaffolding
from bleachers. (Snyder Tr. 132:5-25.) She paused to take photos with Jaramillo
around 2:45 or 3:00 p.m.—police in riot gear are visible in the background of one of
these photos, and in all three photos, it is clear a crowd has overrun structures built
for the Inauguration. (Snyder Tr. 164:10-165:13, Ex. 17, 151:23-152:3, Ex. 10;
Snyder Tr. 162:8-164:9, Ex. 16, Snyder Tr. 173:6-174:24, Ex. 19.) Nonetheless,
Snyder continued until she reached the doors at the entrance to the Capitol building.
(Snyder Tr. 132:3-133:1, 151:23-153:20, Ex. 10.) At her deposition, Snyder marked
the location at the Capitol Building where she posed for selfies on the United States
Capitol Grounds Demonstration Areas Map—she was clearly within the "no
demonstration permitted" zone. (*Compare* UF 14 *with* UF 1.)

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

When Snyder reached the top of the stairs, around 3:30 to 4:00 p.m., she noticed two windows with the glass removed. (Snyder Tr. 137:11-24, 140:15-20; UF 15.) She "hung out" around that area for probably an hour, posing for "selfies," and taking video and photos of the amassed crowds outside the Capitol building's walls and in the Inauguration area before leaving. (Snyder Tr. 140:15-25, 167:1-172:10, Ex. 18; Snyder Tr. 176:15-177:10, Ex. 21; Snyder Tr. 177:11-25, Ex. 22 ; UF 15.)

> **2.      After Snyder posted "selfies" taken during the January 6 riot to a former schoolmate's Facebook page, her former schoolmate forwarded a screenshot to Alight.**

After returning from the Capitol Building, Snyder noticed a Facebook post by a third-party named Sean Armstrong, a high school classmate of hers. (Snyder Tr. 200:5-201:3; Snyder Tr. 213:17-215:6.) Armstrong posted about the violence at the Capitol Building and Snyder retorted that the media lied and "it was a peaceful and fun day!" (Snyder Tr. 212:7-215:6, Ex. 24; Compl., ¶ 10., Fig. 1; Snyder Tr. 218:22-219:21; UF 16.) She also posted photos, including her selfie in front of the broken

window at the Capitol Building from the prior day. (Snyder Tr. 212:7-215:6, Ex. 24; Compl., ¶¶ 10, Fig. 1; UF 16.) Immediately before she boarded her return flight the evening of January 7, Snyder saw Armstrong had tagged Alight on Facebook, writing "Alight employee storming the capital [sic]." (Snyder Tr. 199:22-200:3; Snyder Tr. 212:7-213:4, Ex. 24.) Around the same time, it appears Armstrong also took a screenshot of Snyder's posts and photos and sent it as a private message to Alight's Facebook page. (Kahlich Tr. 18:22-20:12, Ex. 2.)

Alight Digital Marketing Manager of Search Engine Marketing and Organic Search Mary Elizabeth Kahlich ("Kahlich") received a notification about that message on January 7, 2021 and logged into Alight's Facebook account to view it. (UF 17.) When Kahlich realized the message involved the Capitol riot, an intense

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

current event, she copied it and forwarded it to her manager Daniel Arvayo and then-Director of Public Relations MacKenzie Lucas ("Lucas"). (Kahlich Tr. 19:4-7, 65:15-25; Lucas Tr. 11:11-24, 39:13-16; UF 18.) Kahlich later received another message from a third party named Benjamin Krygsheld regarding Snyder's posts and photos. (Kahlich Tr. 84:20-85:4.) Lucas emailed Human Resources Vice President Kaleen Robinson ("Robinson") on the morning of January 8, 2021, attaching Armstrong's screenshot. (UF 19.)

Realizing that Armstrong had tagged her employer on Facebook and presumably recognizing that it reflected poorly on Alight to have one of its employees accused of storming the Capitol, Snyder called Alight Human Resources after she arrived home on January 8, 2021, claiming that she was being "cyberbullied" by her high school Facebook friend. (Snyder Tr. 203:23-205:7; Snyder Tr. 205:12-206:3; 206:22-207:8, 208:21-209:3; 218:22-219:21.) By this point Alight's Human Resources Department was already aware of Armstrong's screenshot from the Facebook message received by Kahlich. (UF 20.)

### 3.   Alight separately investigated Snyder's Facebook posts and her later cyberbullying complaint.

After she saw Lucas' email, Robinson immediately reached out to Alight's Legal Department to alert them about the situation. (Robinson Tr. 46:25-47:13.) Robinson also alerted Alight Chief Customer Experience Officer Cesar Jelvez ("Jelvez") on January 8, telling him that an Alight colleague in his organization was the subject of an investigation for unlawful conduct in violation of Alight's Code of Conduct. (UF 21.) Robinson explained that a photograph of the colleague posted on social media showed that person in front of what appeared to be a broken window at the Capitol Building, which raised the potential that this person went through barricades and barriers designed to prevent demonstrations. (Jelvez Tr. 7:9-8:1; Robinson Tr. 43:12-22, 56:2-10.)

By this point, exhaustive media coverage of the Capitol riot publicized the

closure of the Capitol grounds, not just the building, making clear that the mob trespassed in a restricted area. (*See, e.g.,* RJN, Exs. 2, 5 at 63, 67-68, 71, 6 at 76-80, 89, 8 at 101, 103.) Indeed, also on January 8, the Department of Justice announced it would charge thirteen individuals for crimes committed at the Capitol on January 6, including "knowingly entering or remaining in any restricted building or grounds without lawful authority; or knowingly, with intent to impede government business or official functions, engaging in disorderly conduct on Capitol grounds; and violent entry and disorderly conduct on Capitol grounds." (RJN, Ex. 3.) The same announcement quotes FBI Director Christopher Wray declaring "what took place that day was not First Amendment-protected activity, but rather an affront on our democracy." (*Id.*)

Alight's Communications, Legal, Security, IT, and HR Connect groups collaborated on the investigation. (UF 22.) Human Resources Vice President Kaleen Robinson called Snyder to explain that Alight would conduct a full investigation and that Alight would place Snyder on a paid suspension pending the outcome of the investigation. (Robinson Tr. 102:5-15, Ex. 16; Robinson Tr. 7:1-5; 66:13-20, 102:5-15, Ex. 16, 102:25-103:12, Ex. 17; Snyder Tr. 207:1-209:16, Snyder Tr. 211:12-212:1.) Vice President of Security Mary De Angelo ("De Angelo") called Snyder separately on January 8 to ask about her recollection of the facts of that day. (De Angelo Tr. 12:11-13, 6:9-16; 10:21-11:1, 11:18-23, 7:15-8:11; Robinson Tr. Ex. 17.) Snyder confirmed to De Angelo that she took a couple of selfies outside of the Capitol Building. (UF 23.)

As the investigation progressed, De Angelo, Alight Associate General Counsel Ilene Grant ("Grant"), and Robinson provided information to Alight General Counsel Paulette Dodson ("Dodson") regarding Snyder's involvement in the events of January 6, 2021. (UF 24.) Both Grant and Robinson confirmed that Snyder was in the photo from Armstrong's Facebook message and that Snyder was the person who was in front of the broken window at the Capitol Building. (*Id.*)

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At the same time, HR Connect Case Manager Kris Launzo Mason assigned the cyberbullying report to then-Human Resources Consultant Kelley Tabor (Tabor Tr. 53:5-54:5, 8:11-22.) Tabor quickly reviewed some baseline information on Alight's human resources information system and then contacted Snyder through Microsoft Teams, a messaging and videoconferencing platform. (Tabor Tr. 10:5-16, 15:3-13.) Tabor and Snyder agreed to talk on the phone. Snyder told Tabor that she had concerns with the actions of an external, non-Alight individual, that Snyder and the third-party interacted on Facebook, that the third-party spoke inappropriately to Snyder and also tagged Alight's Facebook page within this interaction. (Tabor Tr. 15:22-17:2.) Tabor confirmed that the third-party was not an Alight colleague and did not work at Alight and discussed actions Snyder could take to ensure her own well-bring and safety, such as reporting the incident to law enforcement or reporting the third-party to Facebook. (Tabor Tr. 17:13-21, 15:22-16:21.) Snyder represented to Tabor and others that she had already involved the police.[4] (Snyder Tr. 219:22-222:6, Ex. 25.) Tabor committed to reaching out to other individuals within Alight to see if there was any need to review Alight's social media. (Tabor Tr. 15:22-17:2.) After the call, Tabor initiated the action she committed to and reached out to a member of Alight's marketing/social media team. (Tabor Tr. 20:20-22:15.) Because Snyder was not reporting conduct of another Alight employee, Tabor could only assist with Snyder's request by inquiring about her safety and suggesting external resources that could assist her. (Tabor Tr. 33:4-25.)

**4.      After concluding Snyder trespassed into a closed area on the Capitol grounds, then publicized her activities on Facebook, Alight terminated her employment.**

General Counsel Paulette Dodson called and spoke to Chief Customer

---

[4]      As Snyder admitted at her deposition, this was false—she never filed a police report and she made no attempt to get a restraining order. (Snyder Tr. 221:23-222:6.)

Experience Office Cesar Jelvez, the executive with ultimate oversight over Snyder's department, on January 10, 2021 regarding the results of the investigation of Snyder. (UF 26.) Dodson informed Jelvez that Snyder had been shown to be at the Capitol Building on January 6, 2021, that there were photographs on social media, and that the company had been tagged in connection with that Facebook post—all of which Snyder confirmed in her discussions with Robinson and De Angelo. (UF 26.) Dodson and Jelvez also discussed Alight's social media policy. (Dodson Tr. 23:1-24:6.) Jelvez understood that Snyder was the person in the photo, that she had attended the Capitol riot, and that she was outside the Capitol Building. (UF 27.) Jelvez concluded that Snyder engaged in unlawful conduct that went against company policy related to both the social media aspect of Alight's Code of Conduct as well as the act of having trespassed barriers and taking a picture next to a broken window at the Capitol Building. (UF 29.) Jelvez decided to terminate Snyder's employment based on the information provided by Robinson and Dodson. (UF 30

On Sunday, January 10, Robinson called Snyder and informed Snyder that Alight would terminate her employment effective January 11, 2021. (Snyder Tr. 210:1-211:5; Snyder Tr. 231:17-232:14, Ex. 27; Robinson Tr. 78:12-15, 104:24-105:13, 106:2-6, Ex. 18.)

## IV.   LEGAL ARGUMENT

### A.   Standard of Law

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.1975), *cert. denied*, 1472 423 U.S. 1025 (1975). "Summary disposition is particularly favored in cases involving First Amendment rights." *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 752 (N.D. Cal. 1993). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An immaterial factual dispute does not bar summary judgment." *British Airways Bd. v. Boeing Co.*, 585 F.2d 946 (9th Cir. 1978), *cert. denied* 440

13

U.S. 981, *rehearing denied* 441 U.S. 968. And "[w]here the record taken as a whole could not lead a rational trier of fact to find for the summary judgment nonmovant, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557 (2009).

**B.   Summary judgment is proper on Snyder's wrongful termination claim because Alight reasonably (and correctly) believed Snyder trespassed at the Capitol Building on January 6, 2021.**

The California Supreme Court uses the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), to analyze retaliation claims. *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1243 (9th Cir. 2013) (citing *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317 (2000)). However, on summary judgment, the *McDonnell Douglas* steps are reversed. To obtain summary judgment, an employer must show either (1) plaintiff cannot establish one of the elements of the claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment. *Lawler*, 704 F.3d at 1242 (citing *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011)). If the employer meets its burden, the discharged employee must demonstrate either that the defendant's showing is insufficient or that there was a triable issue of fact material to the defendant's showing. *Id*. State and federal courts in California have applied the same *McDonnell Douglas* analysis to wrongful termination claims based on an alleged violation of Labor Code sections 1101 and/or 1102. *See, e.g., Brede v. Sci. Applications Int'l Corp*., No. D061764, 2014 WL 793118, at *8 (Cal. Ct. App. Feb. 28, 2014); *Mircovich v. Reuters Am., LLC*, No. 218CV00133CASPJWX, 2019 WL 1585198, at *10 (C.D. Cal. Apr. 8, 2019); *Lew v. Superior Ct. of Cal*., No. C 06-03098 CRB, 2008 WL 728895, at *14 (N.D. Cal. Mar. 17, 2008), *aff'd*, 348 F. App'x 227 (9th Cir. 2009); *accord Anderson v. Union Pac. R. Co*., No. CIV.S.06-2813FCDGGH, 2008 WL 2130320, at *9 (E.D. Cal. May 21, 2008), *aff'd*, 359 F. App'x 800 (9th Cir. 2009) (applying *McDonnell Douglas* analysis to claim for wrongful termination claim in retaliation for hiring an attorney).

1.   **Snyder cannot establish a _prima facie_ claim because there is
no evidence Alight's motivation for terminating Snyder's
employment contravened any substantial public policy.**

The common law claim for wrongful termination permits an "employee who
has suffered damages as a result of such discharge [for refusing to "commit a
criminal act to further its interests"][to] maintain a tort action for wrongful discharge
against the employer." _Tameny v. Atl. Richfield Co_., 27 Cal. 3d 167, 178 (1980).
"The elements of a claim for wrongful discharge in violation of public policy are (1)
an employer-employee relationship, (2) the employer terminated the plaintiff's
employment, (3) the termination was substantially motivated by a violation of public
policy, and (4) the discharge caused the plaintiff harm." _Yau v. Santa Margarita
Ford, Inc_., 229 Cal. App. 4th 144, 154 (2014). "[T]he policy upon which a wrongful
termination claim is based [must be] sufficiently fundamental, well-established and
tethered to a statutory or constitutional provision to support liability." _Carter v.
Escondido Union High Sch. Dist_., 148 Cal. App. 4th 922, 929 (2007). An employee
can only prevail if "the employer's motivation for a discharge contravenes some
substantial public policy principle." _Slivinsky v. Watkins-Johnson Co_., 221 Cal. App.
3d 799, 806 (Ct. App. 1990) (citing _Tameny_, internal quotation and formatting marks
omitted). Snyder's claim for wrongful termination fails because there is no evidence
Alight's motivation for her discharge—its reasonable (and correct) belief that she
trespassed upon closed areas in the Capitol grounds and then publicized her actions
on Facebook—contravenes any public policy.

Snyder alleges her termination was motivated by violations of the public
policies enunciated in sections 98.6, 1101, and 1102 of the California Labor Code.
(Compl., ¶ 23.) Her claim fails because Section 98.6 does not grant employees any
independent substantive rights.[5] While Sections 1101 and 1102 do protect employees

---

[5]   The Court agreed with Alight's position on this issue in its May 5, 2021 Order

15

against specified categories of politically-motivated discharge, neither provision

protects employees who engage in unlawful activity, whether or not that unlawful

activity happens to be politically-motivated. Section 1101 provides:

> No employer shall make, adopt, or enforce any rule, regulation, or policy:
>
> (a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office.
>
> (b) Controlling or directing, or tending to control or direct the political activities or affiliations of employees.
>
> ….
>
> Its sister Labor Code provision, section 1102, states:
>
> No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.

"Sections 1101 and 1102 ... prohibit employers from interfering with 'the

fundamental right of employees in general to engage in political activity." *Couch  v.*

*Morgan Stanley & Co. Inc.*, 656 F. App'x 841, 842 (9th Cir. 2016). "[L]iability under

§§ 1101(a) and 1102 is triggered ***only*** if an employer fires an employee ***based on a***

***political motive***." *Id*. at 843 (emphasis added). In other words, the focus for the

Court's analysis is on the ***employer***'s motive and whether it terminated Snyder for

improper political reasons. In *Couch*, the Ninth Circuit affirmed summary judgment

for the employer because the employer fired plaintiff for "a legitimate, apolitical

reason": it reasonably believed he could not work both as a Financial Advisor and as

a County Supervisor. 656 F. App'x at 843 (that plaintiff was terminated after his

political candidacy was insufficient).

The undisputed evidence, including Snyder's own deposition admissions, are

fatal to any wrongful termination claim tethered to the public policies stated in either

---

concerning Alight's motion to dismiss. (*See* ECF No. 30 at n. 2.) Thus Alight will not re-brief this issue.

Section 1101 or 1102. First, as to section 1101, the undisputed evidence shows that Alight never made, adopted, or enforced any rule, regulation, or policy that influenced the political activities or affiliations of employees. To the contrary: Alight's Code of Conduct provides that "[c]olleagues are free to participate in personal political activities" as long as they "[f]ollow the laws…." (UF 3, 4.) Jelvez, an officer of Alight and the individual who decided to terminate Snyder's employment, testified that Alight's Code of Conduct does not prohibit employees from having different political views. (Jelvez Tr. 16:17-24.) At her deposition, Snyder admitted she is not aware of any Alight rule, regulation, or policy, written or otherwise, forbidding employees from participating in off-duty political activity. (UF 6.) Nor was she aware of any Alight rule, regulation, or policy, written or unwritten, forbidding employees from becoming candidates for political office. (UF 7.) In the absence of evidence of "[a] settled or definite course or method adopted and followed by a government, institution, body, or individual . . . that impeded the political expression of [Alight] employees," Snyder's claim for wrongful termination based on violation of the public policy in section 1101 fails. *See Ross v. Indep. Living Res. of Contra Costa Cnty*., No. C08-00854 TEH, 2010 WL 2898773, at *9 (N.D. Cal. July 21, 2010) (summary judgment on Section 1101 claim proper where no evidence of employer policy discouraging employees from filing ADA lawsuits).

Second, as to section 1102, the undisputed evidence shows Alight also never attempted to influence its employees to follow any particular course or line of political action or political activity. Jelvez testified without contradiction that Alight permits all political views to be expressed by its employees. (Jelvez Tr. 26:13-15.) Alight does not endorse any particular political view. (Jelvez Tr. 26:16-18; Robinson Tr. 63:13-16.) Snyder admitted that Alight never threatened her about engaging in any kind of political activity. (UF 8.) Similarly, Alight never encouraged or urged Snyder to engage in any political activity. (UF 9.) No one in a management position at Alight ever indicated that it was contrary to Alight policy to support Trump or that

17

the company did not want her supporting him. (UF 10.) By way of comparison, even evidence that "(1) [plaintiff] worked in an environment that was openly hostile to his political views; (2) he complained about his contentious Facebook exchange with [a co-worker, about politics]; and (3) he was called a racist for supporting the Republican party" was held to be insufficient to create a triable issue of fact. *See Mircovich*, 2019 WL 1585198, at \*10 (granting summary judgment on claim for violation of Section 1102). The evidence is plain that Snyder's claim for wrongful termination based on violation of the public policy in Section 1102 also fails.

### 2.  Alight had a legitimate reason to terminate Snyder's employment based on the unlawful conduct publicized on Facebook and there is no evidence of pretext.

Even assuming Snyder could establish a *prima facie* case of retaliatory wrongful termination, Alight had a legitimate business interest in severing its relationship with an employee who trespassed on portions of the Capitol grounds closed to the public and then posted about her actions on social media. If an employee can satisfy their *prima facie* case, "the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. A reason is legitimate if it is facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination. If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." *Nakai v. Friendship House Assn. of Am. Indians, Inc.*, 15 Cal. App. 5th 32, 38–39 (2017) (citation and internal quotation and formatting marks omitted); *see also McInteer v. Ashley Distribution Services, Ltd.*, 40 F. Supp. 3d 1269, 1284 (C.D. Cal. 2014) ("Defendants' 'burden is one of production, not persuasion, thereby involving no credibility assessment'") (citing *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1169 (C.D. Cal. 2013).

To demonstrate pretext, "[t]he [employee] cannot simply show that the

18

employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Wills v. Super. Ct*., 195 Cal. App. 4th 143, 160 (2011), *as modified on denial of reh'g* (May 12, 2011) internal quotation marks omitted). "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, ***as long as its action is not for a discriminatory reason***." *Arteaga v. Brink's, Inc*., 163 Cal. App. 4th 327, 344 (2008) (emphasis added). To prove pretext, "[a] plaintiff must offer 'specific' and 'substantial' circumstantial evidence…." *Lawler*, 704 F.3d at 1244 (citing *Winarto v. Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1284 (9th Cir. 2001)). Snyder has adduced no evidence that Alight's reasoning was a pretext for retaliation. Jelvez terminated Snyder's employment after concluding that Snyder violated Alight's Code of Conduct by unlawfully trespassing around the Capitol Building and also by portraying her actions on social media. (UF 26, 27, 29.) By Snyder's own admission, she did precisely that—she walked to the Capitol Building through areas closed to the public by order of the Capitol Police, posed for photos next to the Capitol Building and in an area always closed to demonstrations, and then posted those photos on Facebook. (*See* UF 13-16.)

At her deposition, Snyder speculated that she could have been terminated for reporting the Facebook exchange with Armstrong to Alight, which she has not asserted in her Complaint, but could cite no evidence other than the temporal proximity between her call to Human Resources and her employment termination. (Snyder Tr. 247:19-250:10.) Moreover, "a mere temporal relationship between an employee's protected activity and the adverse employment action, while sufficient for the plaintiff's prima facie case, cannot create a triable issue of fact if the employer offers a legitimate, nonretaliatory reason for the adverse action." *Light v. Dep't of Parks & Recreation*, 14 Cal. App. 5th 75, 94 (2017).

In sum, Snyder can point to no evidence that Alight terminated her

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

employment "based on a political motive." Even assuming she could, Snyder has no evidence that Alight's legitimate business reasons for its actions were pretext. Summary judgment on Snyder's wrongful termination claim is proper.

**C.** **Summary judgment is proper on Snyder's breach of the good faith and fair dealing claim because Snyder expressly agreed she would be an at-will employee.**

"Since the good faith covenant is an implied term of a contract, the existence of a contractual relationship is thus a prerequisite for any action for breach of the covenant." *Kim v. Regents of Univ. of California*, 80 Cal. App. 4th 160, 164 (2000). However, the implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement. *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349-350 (2000). In the employment context, "if an employer's termination decision, however arbitrary, does not breach a substantive contract provision, it is not precluded by the covenant." *Id.* at 350; *Myers v. Park Assist LLC*, 2015 WL 13357660 *2 (C.D. Cal. 2015).

Here, Snyder bases her implied covenant claim solely on her allegation that Alight breached the covenant "by terminating Plaintiff based on pretextual grounds that she had engaged in rioting or trespass, without basis in fact." (Compl., ¶ 31.) However, under section 2922 of the California Labor Code, "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." This language "[e]stablishes a presumption of at-will employment . . . ." *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 629 (1995); *see also Davis v. Consol. Freightways*, 29 Cal. App. 4th 354, 367 (1994) (employer not obligated to progressively discipline prior to terminating at-will employee even though the employer often used progressive discipline). Snyder also admitted she signed an offer letter that ***expressly*** provided her employment was at-will. (UF 11.) Snyder also testified that she understood when she went to work for Alight that she was free to leave and pursue other jobs at any time for any reason. (UF 12.)

While the implied covenant requires mutual fairness in applying a contract's actual terms, it cannot substantively alter those terms. "If an employment is at will, and thus allows either party to terminate for any or no reason, the implied covenant cannot decree otherwise." *Guz*, 24 Cal. 4th at 327; *see also Tomlinson v. Qualcomm, Inc.*, 97 Cal. App. 4th 934 (2002) ("[T]he … express at-will agreement preclude[s] the existence of an implied contract requiring good cause for termination."); *Agosta v. Astor*, 120 Cal. App. 4th 596, 607 (2004) ("Precisely because employment at will allows the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights merely by doing so.") In light of Snyder's express agreement that she was employed at-will, she cannot rely on any purported breach of the implied covenant of good faith and fair dealing to establish the contrary or to limit Alight's ability to terminate her employment.

**D.**     **Summary judgment is proper on Snyder's request for punitive damages because there is no evidence of fraud, oppression, or malice.**

Dismissal of Snyder's punitive damages request is proper because there is no evidence of fraud, oppression, or malice by Alight or any of its employees who interacted with Snyder. To recover punitive damages, Snyder must show by "clear and convincing evidence" that (1) an officer, director, or managing agent (2) committed an act of oppression, fraud, or malice, or authorized or ratified the same. Cal. Civ. Code § 3294; *see also Flores v. Autozone W., Inc.*, 161 Cal. App. 4th 373 (2008) (affirming summary adjudication of punitive damages claim in employment context). "[W]rongful termination, without more, will not sustain a finding of malice or oppression." *Scott v. Phoenix Schools, Inc.*, 175 Cal. App. 4th 702, 717 (2009); *Carr v. Home Depot U.S.A., Inc.,* 2018 WL 2329673, at *8 (S.D. Cal. May 23, 2018) (same). The evidence is clear that Alight investigated Snyder's Facebook post in good faith after third-party Armstrong messaged Alight. (UF 21-24.) Its conclusions were reasonable in light of Snyder's confirmation of her activities on January 6 and

21

the widely-reported closure of the Capitol grounds. (UF 23-25.) Dodson and Robinson based their findings solely on Alight's investigation of Snyder's activities and Jelvez based the termination decision solely on those findings following investigation. (UF 21-30.)

Snyder's request for punitive damages is simply not appropriate where there is no evidence of any "contemptible" conduct. Summary judgment of Snyder's punitive damages request should be granted.

## V.   **CONCLUSION**

Snyder's claims for wrongful termination and breach of the covenant of good faith and fair dealing, as well as her request for punitive damages should be dismissed. There is zero evidence of the most fundamental element of Snyder's case—that her employment was terminated based on a political motive. Terminating an employee who appears to (and did) engage in unlawful trespass is certainly a legitimate business decision. And employers are free to implement such decisions as to their at-will employees. For these reasons, and as set forth above, Alight respectfully requests that the Court grant its Motion for Summary Judgment.

DATED: June 27, 2022

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:  /s/ *Kathleen J. Choi*
Thomas M. McInerney
Kathleen J. Choi

Attorneys for Defendant
ALIGHT SOLUTIONS LLC

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Alight's MPA ISO
MSJ (FINAL   incl.